NUMBER 13-05-563-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


ARANSAS COUNTY NAVIGATION 

DISTRICT NO. 1, Appellant,


v.


JOHN WILLIAM JOHNSON, ET AL., Appellees.

 


On appeal from the 36th District Court of Aransas County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza



 This is a boundary dispute between appellant, Aransas County Navigation District
No. 1 (the "District"), and appellees, John William Johnson, Bobbie Jean Hoofard, and
David Glen Moss, temporary administrator of the estate of Deborah Denise Johnson
Gunnels (the "Johnsons"). The trial court rendered judgment on a jury verdict divesting the
District of a portion of the property conveyed to it by the State of Texas in 1947, concluding
that such conveyance encroached upon the Johnsons' property. By six issues, the District
contends that the trial court erred. We affirm. 

 

I. Background

 On January 21, 1947, the State of Texas issued a patent (the "1947 Patent") which
granted to the District a parcel of land situated on the western shore of Aransas Bay at the
town of Fulton, Texas. The 1947 Patent described the property, which was mostly
submerged under Aransas Bay, by metes and bounds. The District claims that it had
requested the patent from the State to facilitate its efforts to construct a breakwater and
to dredge a harbor on the subject property. The western boundary of the property ceded
by the 1947 Patent lay some 320 feet east of Bay Street. (1)

 Over the six decades since the 1947 Patent, the District made several
improvements to the property, including the construction of a concrete bulkhead, the
installation of pilings for boat slips, and the installation of electrical and water utilities for
boats docked in those slips. The subject property, which was a raw shoreline in 1947, is
now a developed harbor and marina.

 The Johnsons own waterfront property in Fulton situated on the southwest corner
of Fulton Harbor. The property owned by the Johnsons is formally described as "the Water
Front east of Lots 1, 2, 3, 4, and 5 of Block 1, Fulton Townsite." It is undisputed that the 
property extends from Bay Street on its west side to the western shoreline of Aransas Bay
on its east side. At various times since the 1947 Patent was issued, the Johnsons had
either operated a marina on the shoreline property or leased the marina for others to
operate.

 On April 12, 1989, the District notified Hoofard that a portion of the property being
used by the Johnsons as a marina belonged to the District and that the Johnsons had no
lease agreement with the District that would allow such use. In 1992, John Johnson met
with the Aransas County Surveyor, Jerald Brundrett, to discuss the matter. Brundrett
explained to Johnson that the western boundary of the land ceded to the District according
to the 1947 Patent lay across a portion of the marina property. At the time, the marina was
being operated by a tenant, Alby's Seafood ("Alby"), which was paying rent to both the
Johnsons and the District. When Alby's lease with the Johnsons terminated on January
1, 2000, the District began charging rent directly to the owners of the boats docked at the
marina.

 On March 30, 2001, the Johnsons filed suit against the District seeking damages
from the District as well as declaratory and injunctive relief. (2) The Johnsons claimed that 
they, not the District, were rightful owners of the property on which the marina was located
and therefore that the District owed to them any rent payments paid to the District for use
of the marina property. The District filed a first amended answer on October 29, 2003,
denying the Johnsons' allegations and also asserting in the alternative a defense based
upon the statute of limitations. (3)

 The location of the western boundary of the property granted by the 1947 Patent,
defined precisely by metes and bounds in the patent document, is undisputed. Moreover,
the parties agreed that the eastern boundary of the Johnsons' property was defined by the
natural shoreline of Aransas Bay, without regard to any artificial alterations of the shoreline. 
The central issue in dispute, then, was the actual location of the natural shoreline. The
Johnsons claimed that it lay to the east of the western boundary of the District's property
as specified in the 1947 Patent, and therefore the 1947 Patent encroached upon the
Johnsons' property. The District, on the other hand, contended that the natural shoreline
was situated to the west of the western boundary of the District's property as specified in
the 1947 Patent, and so there was no encroachment.

 The matter proceeded to jury trial primarily on the issue of the location of the
shoreline. The jury returned a verdict favorable to the Johnsons, and on June 8, 2005, the
trial court rendered a judgment based upon that verdict. (4) The judgment stated in relevant
part that the Johnsons "are entitled to possession and ownership of all the Waterfront east
of Lots 1, 2, 3, 4, and 5 of Block 1 of Fulton Townsite." The judgment also precisely
defined the property belonging to the Johnsons as encompassing the area containing the
marina. The District filed a motion to correct the judgment and for new trial on July 1,
2005. The trial court denied the motion on September 8, 2005. This appeal ensued.

II. Discussion

 On appeal, the District alleges that: (1) the evidence was legally and factually
insufficient to support the jury's verdict; (2) errors in the jury charge required a new trial; (3)
the jury's verdict does not support the judgment; (4) the Johnsons' trial counsel asked
improper questions of the prospective jurors at voir dire; (5) the trial court improperly
allowed the testimony of a previously undisclosed witness; and (6) the District was entitled
to submission of its claim of title by limitations. (5)

 We note at the outset of our analysis that the parties do not dispute two well-settled
tenets of law with regard to riparian land boundaries. First, a shoreline boundary is
determined by measuring the shoreline at the mean daily high water level, or high tide. (6) 
Second, when a boundary is defined by a shoreline, and that shoreline moves over time,
the boundary moves along with the shoreline only if the land is "gradually or imperceptibly
added or taken to or from" the shore by erosion or accretion. Coastal Indus. Water Auth.
v. York, 532 S.W.2d 949, 952 (Tex. 1976). (7) If, however, the shoreline moves seaward by
means other than natural accretion, the boundary stays where it was and the riparian
owner does not become owner of the new land. See Lorino v. Crawford Packing Co., 175
S.W.2d 410, 414 (Tex. 1943). Further, the seaward movement of a shoreline boundary
is presumed to be artificial, and the burden is placed on the riparian owner to prove
otherwise. Luttes v. State, 324 S.W.2d 167, 187 (Tex. 1958).

A. Sufficiency of the Evidence

 By its first issue, the District alleges that the evidence produced at trial was neither
legally nor factually sufficient to support the jury's verdict. We disagree. An appellate court
will sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence
from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact. City of Keller v. Wilson, 168 S.W.3d 802, 810
(Tex. 2005). In conducting a legal sufficiency review, we credit evidence supporting the
judgment if reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not. Id. at 827; Villagomez v. Rockwood Specialties, Inc., 210 S.W.3d 720,
748 (Tex. App.-Corpus Christi 2006, pet. denied). More than a scintilla of evidence exists,
and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for
differing conclusions by reasonable minds about a vital fact's existence. Lee Lewis Constr.
Co. v. Harrison, 70 S.W.3d 778, 782-83 (Tex. 2001).

 In conducting a factual sufficiency review, we must not merely substitute our
judgment for that of the jury; rather, we view all the evidence in a neutral light to determine
whether the contested finding is so contrary to the great weight and preponderance of the
evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. 
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003); Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Villagomez, 210 S.W.3d at 749.

 1. The Johnsons' Evidence

 The Johnsons' evidence at trial centered on the testimony of Henry Warren, a
licensed land surveyor. Warren had conducted a survey of the marina property and
concluded that the property that was granted to the District by the 1947 Patent encroached
upon the property belonging to the Johnsons. In doing so, Warren determined that the
original, natural shoreline--and thus the eastern boundary of the Johnsons' property--lay
to the east of the western boundary of the property ceded to the District in 1947.

 The record reflects that Warren based his findings primarily upon four different
depictions of the shoreline as it existed around the time of the 1947 Patent: (1) a map
made for the District in May 1947 by James Jarboe; (2) a plat made for the District in 1946
by W. A. Raatz, a District engineer; (3) a survey conducted in 1946 by the District as part
of an application to construct a breakwater; and (4) a hydrographic map prepared by the
U.S. Army Corps of Engineers. All four maps depicted two protrusions of land extending
east of Bay Street, separated by a harbor. The Warren survey concluded, based on these
maps, that the natural shoreline in that area lay to the east of both protrusions of land and
the harbor, in Aransas Bay.

 To explain why the natural shoreline lay not only to the east of the land, but also to
the east of the harbor, Warren asserted that boat owners "kicked out" the land that
originally existed where the harbor now was situated. "Kicking out," according to Warren,
is a crude form of dredging whereby one would back one's boat up onto the land, and run
the propellers of the boat to agitate and loosen the dirt lying underneath, leaving a rough
channel. Warren testified that he had interviewed several "historical witnesses" who had
described the "kicking out" process.

 The Johnsons also presented testimony from three witnesses who lived in Fulton
and who described the nature of the shoreline as it existed around the time of the 1947
Patent. Gene Sprinkle, a Fulton resident since his birth in 1932, testified that the land as
it originally existed was "kicked out" to create the harbor and that "I have done a little bit
of it [kicking out] myself." Sprinkle also testified that an oyster reef existed in 1938 south
of the two protrusions of land. Gene DeForrest, born in 1930 and also a lifetime area
resident, also testified regarding the oyster reef and the "kicking out" process. 

 Finally, the Johnsons presented the testimony of Dale Owens. (8) Owens testified that
he lived for seventeen years near the Fulton waterfront, starting with the year of his birth
in 1933. Owens drew a rudimentary map of the area in question as he remembered it from
before 1947; the map was admitted into evidence. The Owens map included the two
protrusions of land separated by a harbor as well as the oyster reef to the south of the
protrusions. Owens testified that there were sunflowers and blackberries growing along
the protrusion of land laying to the south of the harbor and that he knew this because he
had "picked them [the blackberries] many times." When asked by the Johnsons' trial
counsel whether or not "blueberries grow on fill," Owens responded: "Not to my
knowledge." The Johnsons argued that Owens's testimony showed that the land
protrusions could not have been artificial and therefore they must have been landward of
the natural shoreline; i.e., part of the Johnsons' property.

 2. The District's Evidence

 The District's trial evidence consisted of testimony from two witnesses as well as
several depictions of the area that, according to the District, conclusively show that there
was an artificial seaward movement of the shoreline between 1930 and 1948. First, the
District presented a plat of the area at issue created in 1878 which showed the shoreline
lying just to the east of Bay Street, with no substantial land masses extending into Aransas
Bay. The District also introduced a 1888 map of the area that similarly showed only a
small sliver of land in between Bay Street and the shoreline.

 The District also presented several aerial photographs of the area to the jury. First
was a photograph taken in 1930, which the District claims is the earliest known aerial
photograph of the area at issue. The 1930 photograph, taken from what appears to be
directly overhead, did not show Bay Street; this was because, according to the District, the
street had been platted but had not yet been built. The District presented a copy of the
photograph with a dotted blue line drawn in; Jerald Brundrett, the Aransas County
Surveyor, testified that the blue line accurately represented the future location of Bay
Street. The 1930 photograph showed only a sliver of land existing between the dotted blue
line and the shoreline.

 The District compared this 1930 photograph with another overhead aerial
photograph taken in 1948. The 1948 photograph showed that Bay Street had been built
by that time; it also showed the two protrusions of land extending eastward from Bay Street
into Aransas Bay. (9) The District presented the comparison of 1930 and 1948 photographs
to the jury in the form of a series of slides, with the latter photograph tinted blue and
superimposed on the former at various levels of transparency. The first slide consisted of
both photographs with the 1948 photograph being 100% transparent, so that the jury saw
only the 1930 photograph; the successive slides gradually introduced the 1948 photograph
at lower levels of transparency until the final slide which presented only the 1948
photograph. Brundrett testified that the direct comparison of the two photographs was
appropriate because they were "geo-rectified"; that is, aligned as to scale and common
geographical features. The presentation clearly showed protrusions of land in the 1948
photograph at the location where no land appeared in the 1930 photograph. The District
contended that this was conclusive proof that the shoreline had moved dramatically
seaward between 1930 and 1948.

 Even if the jury found that the shoreline had moved, the boundary to the Johnsons'
property would nevertheless move along with the shoreline if it were shown that the
movement was the result of natural accretion or erosion. See York, 532 S.W.2d at 952;
Lorino, 175 S.W.2d at 414. For that reason, the District argued that not only was there a
clear movement in the shoreline between 1930 and 1948 as depicted in the photographs,
but that this movement was too dramatic in too short a period of time to have been the
result of natural accretion. Katherine Blount, a geology and environmental sciences
professor at Texas A&M University-Corpus Christi, testified with reference to the 1930 and
1948 photographs that "this magnitude of change doesn't happen naturally along a fairly
low energy environment coastline like the Texas coast."

 3. Analysis

 The District claims that its evidence conclusively established that there was a
seaward movement of the shoreline in between 1930 and 1946; moreover, it notes that the
Johnsons cannot now claim that such movement was gradual or imperceptible. See York,
532 S.W.2d at 952. That is because the Johnsons' trial counsel explicitly foreclosed that
assertion at a pre-trial hearing. (10)

 However, the Johnsons do not base their argument on the assertion that there was
a natural movement in the shoreline between 1930 and 1948 that would have caused their
boundary to shift to the east. Rather, the Johnsons claim that there was no movement at
all of the shoreline, as defined by the mean daily high tide. According to the Johnsons, to
the extent the 1930 and 1948 photographs appear to show a different shoreline, this is
because a channel or harbor was "kicked out" of land that already existed. The Johnsons'
trial counsel emphasized that the "kicking out" process was the reason that, where there
appeared to be a solid shoreline in 1930, there appeared to be a harbor in between two
protrusions of land in 1946. The Johnsons' counsel essentially asked the jury to disregard
the photographic comparison, which, if taken as accurate, "geo-rectified" depictions of the
natural shoreline at the relevant times, showed that land had been added over those
sixteen years rather than taken away.

 The District contends that the jury was not free to disregard the photographic
comparison, which they consider to be conclusive proof that a seaward movement of the
shoreline in fact did occur. However, the jury was not obliged to believe that the 1930
photograph accurately depicted the mean daily high water level of Aransas Bay. Although
the photographs of the shoreline are probative when viewed together, they do not
conclusively establish that Warren's testimony regarding the boundary of the Johnsons'
property was incorrect. See City of Keller, 168 S.W.3d at 810. Although it may appear to
the District that the jury's discounting of the photographic comparison was unreasonable,
the jury was not required to believe that evidence any more than they were required to
believe the testimony of any particular witness. See id. at 819 ("Jurors are the sole judges
of the credibility of the witnesses and the weight to give their testimony. They may choose
to believe one witness and disbelieve another."). Indeed, Warren testified as follows:

[F]or a photo to be significant in the determination of the shore, you have to
know the day, you have to know the time and you have to know the elevation
of the water as shown by tide gages, and then you can use it to determine
where the shore is.


The District did not present any evidence as to the time of day or year when the 1930
photograph was taken. Warren's testimony therefore provided a reasonable basis for the
jury to conclude that the 1930 photograph did not accurately depict the natural shoreline
as defined by the mean daily high water level.

 Moreover, Sprinkle testified that he recalled fishing for flounder on land now claimed
by the District, as early as 1938. According to the Johnsons, this testimony indicated that
the marina property was to the west of the natural shoreline. Although the District may
consider dubious the testimony of a 72-year-old man regarding his experiences as a six-year-old, as in Sprinkle's case, the jury clearly did not. A reviewing court cannot substitute
its judgment for that of the trier of fact, so long as the evidence falls within a zone of
reasonable disagreement. Id. at 822.

 We conclude that the evidence furnished a reasonable basis for the contention that
Warren's survey properly located the natural shoreline defining the boundary of the
Johnsons' property. As such, there was more than a scintilla of evidence to support that
finding. See Harrison, 70 S.W.3d at 782-83. The evidence did not conclusively establish
that Warren's survey was incorrect. See City of Keller, 168 S.W.3d at 810. Additionally,
viewing the evidence in a neutral light, we cannot conclude that the jury's conclusion was
so contrary to the preponderance of the evidence as to be manifestly unjust or shock the
conscience. See Jackson, 116 S.W.3d at 761. Therefore, the evidence presented at trial
by the Johnsons was legally and factually sufficient to support the jury's verdict. 
Accordingly, the District's first issue is overruled.

B. Jury Charge

 By its second issue, the District contends that the charge submitted to the jury was
fatally defective in two ways, and that a new trial is therefore required. First, the District
contends that the jury charge was improper because it asked the jury whether the Warren
survey was "substantially correct." The second error alleged by the District with respect
to the jury charge is that the trial court did not include an instruction on the law regarding
a seaward movement of a boundary shoreline.

 Texas Rule of Civil Procedure 278 requires the trial court to submit instructions and
definitions to the jury as are necessary to enable the jury to render a verdict. Tex. R. Civ.
P. 278. The goal of the charge is to submit to the jury the issues for decision logically,
simply, clearly, fairly, correctly, and completely. Hyundai Motor Co. v. Rodriguez, 995
S.W.2d 661, 664 (Tex. 1999). Failure to submit a question is not deemed grounds for
reversing the judgment unless its submission, in substantially correct wording, has been
requested in writing by the party complaining of the judgment. Tex. R. Civ. P. 278. As long
as the charge is legally correct, trial courts are afforded broad discretion, subject to
reversal only on a court's abuse of that discretion. Tex. Dep't of Human Servs. v. E.B., 802
S.W.2d 647, 649 (Tex. 1990); Hagins v. E-Z Mart Stores, Inc., 128 S.W.3d 383 , 387 (Tex.
App.-Texarkana 2004, no pet.). Even if the trial court abused its discretion, we reverse
only where the error in the jury charge is shown to be harmful. Boatland of Houston, Inc.
v. Bailey, 609 S.W.2d 743, 749-50 (Tex. 1980). Moreover, a jury charge error is reversible
only if it probably caused the rendition of an improper judgment or probably prevented the
appellant from properly presenting the case on appeal. Tex. R. App. P. 44.1(a).

 1. "Substantially Correct"

 Question number one of the jury charge read as follows: "Do you find from a
preponderance of the evidence that the survey prepared by Harry Warren in July of 2003
is a substantially correct description of the natural shoreline?" (11) The jury answered in the
affirmative. At trial, the District objected to the inclusion of this question, claiming that "the
modifier 'substantially' allowed the jury completely unguided discretion about how close the
Warren survey had to be to the actual natural shoreline in order to be 'substantially'
correct." The District now contends that the inclusion of this question was error because
"the word 'substantially' could be interpreted by the jury as requiring accuracy to within
inches, feet, or hundreds of yards." The Johnsons, on the other hand, contend that the
phrase "substantially correct" has an ordinary meaning of "truly or really accurate" (12) and
that the jury could not have been asked to define the boundary to any more demanding
standard of accuracy.

 In a boundary dispute, the ultimate object of the trier of fact is to determine the "true
location of the line in dispute." Mortgage Inv. Co. of El Paso v. Bauer, 493 S.W.2d 339,
342 (Tex. Civ. App.-El Paso 1973, writ ref'd n.r.e.), overruled on other grounds, Martin v.
Amerman, 133 S.W.3d 262, 268 (Tex. 2004). Moreover,

[w]hen this cannot be done with reasonable certainty due to the lapse of time
or the obliteration of the evidence of the original locater, it is not only
permissible, but, out of necessity, required that the courts resort to any
evidence tending to establish the place of the original footsteps of the
surveyor which meet the requirement that it is the best evidence of which the
case is susceptible.


Bauer, 493 S.W.2d at 342. In other words, where "exactness [is] difficult of attainment, [it]
should not be insisted upon, to the destruction of right." State v. Humble Oil & Ref. Co.,
187 S.W.2d 93, 107 (Tex. Civ. App.-Waco 1945, writ ref'd w.o.m.) (citing Hamilton v.
Menifee, 11 Tex. 718, 749 (1854)).

 Although the parties do not direct us to, nor can we find, any Texas case interpreting
the phrase "substantially correct" as used in a boundary dispute jury charge, courts have
clarified the phrase in other contexts. In fact, as noted above, Texas Rule of Civil
Procedure 278 provides that a trial court's failure to submit an issue shall not be grounds
for reversal of the judgment unless the issue was previously tendered by the appellant in
"substantially correct" wording. Tex. R. Civ. P. 278. In that context, the Texas Supreme
Court has stated that:

Substantially correct . . . does not mean that it must be absolutely correct,
nor does it mean one that is merely sufficient to call the matter to the
attention of the court will suffice. It means one that in substance and in the
main is correct, and that is not affirmatively incorrect.


Placencio v. Allied Indus. Int'l, Inc., 724 S.W.2d 20, 21 (Tex. 1987) (citing Modica v.
Howard, 161 S.W.2d 1093, 1094 (Tex. Civ. App.-Beaumont 1942, no writ)) (emphasis
added). If the phrase "substantially correct" were given the same meaning in the present
context, question number one of the jury charge would be sufficient to determine the "true
location" of the boundary in dispute. See Bauer, 493 S.W.2d at 342.

 We conclude that the trial court did not abuse its discretion by including in the jury
charge a question of whether the Warren survey was "substantially accurate."

 2. Instruction on Effect of Seaward Movement of Shoreline Boundary

 The District also challenges the trial court's decision not to include an instruction on
the law regarding the movement of shoreline boundaries. In their Requested Jury
Question No. 1, the District included the following sentence: "You are instructed that a
seaward movement of a shoreline is presumed to be artificial unless it is proven to have
been gradual, natural, and imperceptible." The trial court declined to include this
instruction in the jury charge. The District now contends that this decision was an abuse
of discretion, claiming that without the instruction, the jury was free to find an artificial
seaward movement of the shoreline and still find in favor of the Johnsons. In response,
the Johnsons state that the inclusion of the District's proposed instruction would have
impermissibly "commented on the weight of the evidence." See Associated Carriages, Inc.
v. Int'l Bank of Commerce, 37 S.W.3d 69, 75 (Tex. App.-San Antonio 2000, pet. denied). 
The Johnsons also contend that the instruction was unnecessary and would have
improperly "tilt[ed]" or "nudge[d]" the jury. See Wal-Mart Stores, Inc. v. Johnson, 106
S.W.3d 718, 723-24 (Tex. 2003).

 Without passing on the validity of the Johnsons' contentions, we note that the
District's proposed instruction was not an accurate description of the law pertaining to the
movement of shoreline boundaries. The supreme court has stated that "[t]he general rule
is that a riparian or littoral owner acquires or loses title to the land gradually or
imperceptibly added or taken to or from his fast bank or shore." York, 532 S.W.2d at 952
(emphasis added). The District's proposed instruction, however, stated that a seaward
movement is presumed to be artificial unless it is "gradual, natural, and imperceptible"
(emphasis added). The difference is not negligible. Had the District's proposed instruction
been included, the jury could have found that there was a gradual and natural seaward
movement of the shoreline, and yet if the movement was perceptible, the jury would have
incorrectly concluded that the boundary did not move with the shoreline.

 We conclude that the trial court did not abuse its discretion in its formulation of
question number one of the jury charge because the District failed to submit its requested
instruction in substantially correct wording. See Tex. R. Civ. P. 278. The District's second
issue is therefore overruled.

C. Verdict Support for the Judgment

 The District asserts, by its third issue, that the jury verdict did not support the
judgment issued by the trial court. Specifically, the District contends that the trial court
improperly included in its judgment a precise description of the boundaries of the
Johnsons' property adopted from the Warren survey, even though the jury merely found
that the Warren survey was "substantially correct." In accordance with our conclusion
above that the "substantially correct" wording was sufficient to establish the true location
of the boundary in dispute, we find that the jury verdict provided sufficient support for the
court's final judgment precisely defining that boundary. The District's third issue is
overruled.

D. Voir Dire Examination

 By its fourth issue, the District claims that it was unfairly prejudiced by questions
asked at voir dire by the Johnsons' trial counsel. The following exchange between the
attorneys and the trial court illustrates the dispute:

 [Johnsons' counsel]: How would it make you feel if land had been in your
family five years, ten years, 50 or 60 like the Johnsons -


 [District's counsel]: Excuse me, your Honor. I'm going to -


 [Johnsons' counsel]: - and somebody -


 [District's counsel]: Excuse me, counsel. I'm sorry to interrupt. I am going
to object to this question as asking the jury to place themselves
in a position of one side of the case and ask - improper
presenting the case.


 THE COURT: I haven't really heard the full question as to where he is going
with it. I'll sustain as to that regard. Rephrase your question,
please, Mr. Casterline [Johnsons' counsel].


 [Johnsons' counsel]: How would it make you feel if someone came up to
you and said you think that is your land? It's my land. Get off. 
How would it make you feel?


 [District's counsel]: Your Honor, that is the question, and that is what I'm
objecting to.


 THE COURT: Okay. I will sustain that.


 [Johnsons' counsel]: May we approach, your Honor?


 THE COURT: You may.


(Off-the-record discussion at the bench)[ (13)]


 [Johnsons' counsel]: Let me start here on the first row. How would it make
you feel, sir, if land in your family for years was suddenly in
jeopardy? Someone told you, hey, that is my land. I am going
to take it away from you. Tell me how that would make you
feel.


 The District states that the trial court abused its discretion in permitting the
Johnsons' counsel to ask these questions, citing two cases where courts found it to be
improper for counsel at closing argument to ask a juror to place himself in the position of
the plaintiff. See Fambrough v. Wagley, 169 S.W.2d 478, 480-82 (Tex. 1943); S. Pac. Co.
v. Hayes, 391 S.W.2d 463, 468-69 (Tex. Civ. App.-Corpus Christi 1965, writ ref'd n.r.e.). 
The District claims that "there is no apparent reason for applying a different rule to the voir
dire examination of the jury panel." We disagree.

 The Texas Supreme Court has recognized that "trial courts should allow broad
latitude to counsel" at voir dire examination "to discover any bias or prejudice by the
potential jurors so that peremptory challenges may be intelligently exercised." Hyundai
Motor Co. v. Vasquez, 189 S.W.3d 743, 749 (Tex. 2006) (internal quotations omitted); see
also Green v. Ligon, 190 S.W.2d 742 (Tex. Civ. App.-Fort Worth 1945, writ ref'd n.r.e.)
(stating that "our courts have been very liberal in permitting a broad range of inquiries on
voir dire to enable counsel to intelligently use their peremptory challenges"). The scope
of such examination rests largely in the sound discretion of the trial court. Babcock v. Nw.
Mem'l Hosp., 767 S.W.2d 705, 709 (Tex. 1989). To obtain a reversal, an appellant must
show that the trial court abused its discretion and that the error was calculated to cause
and probably did cause the rendition of an improper judgment. Tex. R. App. P. 44.1;
Babcock, 767 S.W.2d at 709.

 In Hyundai Motor Co., the supreme court emphasized that the trial court is in the
best position to determine whether a voir dire question is proper:

The Texas Constitution guarantees a trial by a fair and impartial jury, and our
courts use voir dire to achieve that goal. Voir dire inquiries that explore
external biases and unfair prejudices further the effort, but those that test
jurors' possible verdicts based on case-specific relevant evidence detract
from it. The distinction between the two in some cases is a fine one. Thus,
we vest trial judges with the discretion to decide whether an inquiry
constitutes the former or the latter; as appellate courts, we should defer to
their judgment.


189 S.W.3d at 760.

 Here, the Johnsons contend that their counsel's voir dire questions were intended
to solicit the potential jurors' honest opinions and values regarding the subject matter of
the dispute. A voir dire examination need not be confined to matters which might be
grounds for challenge for cause. Greenman v. City of Fort Worth, 308 S.W.2d 553, 554
(Tex. Civ. App.-Fort Worth 1957, writ ref'd n.r.e.). Deferring to the trial court's superior
ability to determine the reasonableness of a voir dire question under the circumstances,
see Hyundai Motor Co., 189 S.W.3d at 755, we cannot say that the trial court abused its
discretion here. Accordingly, the District's fourth issue is overruled.

E. Testimony of Dale Owens

 By its fifth issue, the District contends that the trial court improperly permitted the
Johnsons to call Dale Owens, who had not been previously disclosed to the District, as a
rebuttal witness at trial.

 Texas Rule of Civil Procedure 193.6(a) provides that a party who fails to timely
make, amend, or supplement a discovery response may not introduce in evidence the
undisclosed material or unidentified witness unless the court finds that: (1) there was good
cause for the failure to timely make, amend, or supplement the discovery response; or (2)
the failure to timely make, amend, or supplement the discovery response will not unfairly
surprise or unfairly prejudice the other parties. Tex. R. Civ. P. 193.6(a). The burden of
showing good cause, or lack of unfair surprise or unfair prejudice, is on the party seeking
to introduce in evidence the undisclosed material or unidentified witness. Tex. R. Civ. P.
193.6(b). Further, a finding of good cause or lack of unfair surprise or unfair prejudice
must be supported by the record. Id.

 The District contends that it was unfairly surprised and prejudiced by Owens's
testimony regarding his picking blackberries as a child on the protrusions of land extending
into Aransas Bay. (14) The District's trial counsel, however, in objecting to Owens's testifying,
admitted to the trial court that Owens was "just another historical witness" whose testimony
was "just a cumulation of [the Johnsons'] case in chief." The admission of evidence that
is merely cumulative, and not dispositive of the case, is not reversible even if in error. See
Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989) (stating that "[t]his court
will ordinarily not find reversible error for erroneous rulings on admissibility of evidence
where the evidence in question is cumulative and not controlling on a material issue
dispositive of the case"). Although the District's counsel asserts on appeal that he was
misquoted in calling Owens's testimony a "cumulation," the District has not made a request
to this Court or to the trial court that the reporter's record be corrected. See Tex. R. App.
P. 34.6(e)(2) (requiring the trial court to settle disputes regarding alleged inaccuracies in
reporter's record), 34.6(e)(3) (providing that the appellate court may submit to the trial court
any post-appeal disputes as to alleged inaccuracies in reporter's record).

 In any case, our review of the record reveals that Owens's testimony was indeed
cumulative of the prior evidence introduced by the Johnsons. Owens' testimony simply
bolstered the Johnsons' theory that the protrusions of land as shown in the 1946
photograph were natural because blackberries had grown there. Warren, the Johnsons'
expert witness in their case in chief, testified that he had interviewed Owens and that
"[Owens] told me that this land had always been there, that it even had blackberries on it. 
They use[d] to come down and pick blackberries on that piece of land." The District
objected to Warren's testimony regarding Owens's statement as hearsay, but that
objection was overruled by the trial court. Further, the trial court's decision to overrule that
objection is not challenged by the District on appeal.

 We conclude that Owens's testimony was merely cumulative of the Johnsons' case
in chief. Therefore, even if we were to agree with the District that the Johnsons failed to
meet their burden under rule of civil procedure 193.6, any error committed by the trial court
in permitting Owens's testimony was harmless. See Tex R. Civ. P. 193.6; Gee, 765
S.W.2d at 396. The District's fifth issue is overruled. See Tex. R. App. P. 44.1(a)(1).

F. District's Claim of Title by Limitations

 The District's sixth issue on appeal concerns the trial court's decision not to include
questions in the jury charge as to the District's claim of adverse possession to the property
in dispute under both the three-year and five-year statutes of limitations. See Tex. Civ.
Prac. & Rem. Code Ann. §§ 16.024, 16.025 (Vernon 2002).

 Texas Rule of Civil Procedure 278 provides a substantive, non-discretionary
directive to trial courts requiring them to submit requested questions to the jury if the
pleadings and any evidence support them. Tex. R. Civ. P. 278; Elbaor v. Smith, 845
S.W.2d 240, 243 (Tex. 1993). That is, a trial court may refuse to submit an issue only if
no evidence exists to warrant its submission. Elbaor, 845 S.W.2d at 243 (citing Brown v.
Goldstein, 685 S.W.2d 640, 641 (Tex. 1985)). Failure to submit a question is not deemed
grounds for reversing the judgment unless its submission, in substantially correct wording,
has been requested in writing by the party complaining of the judgment. Id. A claim that
the evidence was legally or factually insufficient to warrant the submission of a question
may be made for the first time after the verdict, regardless of whether the submission of
such question was requested by the complainant. Tex. R. Civ. P. 279.

 Here, the District submitted the following Requested Jury Question No. 2:

 Do you find that, for more than three years before March 30, 2001, the
Navigation District held the property in dispute under title and the Navigation
District, or one or more persons leasing from it, were in peaceable and
adverse possession of any portion of the property in dispute?


The District also submitted the following Requested Jury Question No. 3:

 Do you find that, for more than five years before March 30, 2001, the
Navigation District claimed the property in question under a duly registered
deed and that the Navigation District or one or more persons leasing from
the Navigation District, were in peaceable and adverse possession of any
portion of the property and used or enjoyed it?


Both jury questions requested by the District included a definition of "adverse possession"
as "an actual and visible appropriation of real property, commenced and continued under
a claim of right that is inconsistent with and is hostile to the claim of another person." (15)

 To establish its entitlement to a jury question as to the three-year statute of
limitations, the District was required to present evidence that it possessed the land in
dispute peaceably and adversely under title or color of title for at least three years. Tex.
Civ. Prac. & Rem. Code Ann. § 16.024. To establish its entitlement to a jury question as
to the five-year statute, the District was required to present evidence that it cultivated,
used, or enjoyed the land peaceably and adversely under a duly registered deed while
paying applicable taxes, for at least five years. Id. § 16.025.

 Our review of the record reveals no evidence indicating that the District exclusively
occupied the property claimed by the Johnsons. The District notes that "[f]rom about 1992
to 2000, the District was charging rent to the Johnsons' tenant for the portion of the marina
property that lay within the patent boundaries." (16) However, joint or common possession
by the adverse possession claimant and the owner defeats the requisite quality of
exclusiveness. Turner v. Mullins, 162 S.W.3d 356, 367 (Tex. App.-Fort Worth 2005, no
pet.); West End API, Ltd. v. Rothpletz, 732 S.W.2d 371 (Tex. App.-Dallas 1987, writ ref'd
n.r.e.); see Rick v. Grubbs, 214 S.W.2d 925, 927 (Tex. 1948). Moreover, proof that the
owner's tenant is in possession at the same time as the claimant is not sufficient to sustain
a claim of adverse possession. Solis v. La Brisa Land & Cattle Co., 361 S.W.2d 631, 632
(Tex. App.-San Antonio 1962, no writ) (citing Rick, 214 S.W.2d at 927).

 The allegations that the District charged rent to tenants of the Johnsons was
insufficient to establish exclusive possession by the District, which is a required element
under both statutes of limitations. See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.024,
16.025. We therefore conclude that the trial court did not err in declining to include
questions in the jury charge as to the District's claim of adverse possession under those
statutes. See Tex. R. Civ. P. 278; see also Elbaor, 845 S.W.2d at 243 (holding that a trial
court may refuse to submit an issue in a jury charge if there is no evidence to warrant its
submission). The District's sixth issue is overruled.

 



III. Conclusion

 Having overruled the District's six issues, we affirm the judgment of the trial court.


 _______________________

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 29th day of April, 2008.
1. Bay Street in Fulton is now known as Casterline Drive. We will here refer to the street as Bay Street,
which was its name as used in all depictions of the area at issue presented at trial.
2. On July 7, 2003, the Johnsons filed a "Third Amended Petition for Declaratory Judgment & Other
Relief" which added as defendants Dan Gill, Tony Dominguez, Lynn Wildman, Felix Keeley, and Doug Norrell,
named both as individuals and in their official capacities as commissioners of the District. On November 18,
2003, the trial court dismissed the Johnsons' case against these defendants by written order. The Johnsons
do not challenge this dismissal on appeal, and these defendants are not parties to this appeal.


 Additionally, we note that, several months after the Johnsons filed their final amended petition, the
Texas Supreme Court ruled that trespass to try title is the exclusive remedy for boundary disputes and that
relief under the Declaratory Judgments Act is not available in such disputes. Martin v. Amerman, 133 S.W.3d
262, 268 (Tex. 2004). Subsequently, the Texas Legislature amended the Declaratory Judgments Act to reflect
that:

a person [interested under a deed, will, written contract, or other writings constituting a
contract or whose rights, status, or other legal relations are affected by a statute, municipal
ordinance, contract or franchise] may obtain a determination under this chapter when the
sole issue concerning title to real property is the determination of the proper boundary line
between adjoining properties.


Act of Apr. 18, 2007, 80th Leg., R.S., ch. 305, § 1, 2007 Tex. Sess. Law Serv. 583, 583 (codified at Tex. Civ.
Prac. & Rem. Code Ann. § 37.004(c) (Vernon Supp. 2007)). The District has not raised the issue of whether
the Martin ruling applies to this case or if the amended statute applies retroactively, and so we do not consider
it here. See Tex. R. App. P. 47.1; Martinez v. El Paso County, 218 S.W.3d 841, 844 (Tex. App.-El Paso 2007,
pet. dism'd) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not
raised in the appellant's brief.").
3. Along with their first amended answer, the District also filed a counterclaim against the Johnsons
contending that it had equitable title to the property in question. Specifically, the District alleged that:


By written contract dated August 20, 1946, the Johnsons' predecessors in title agreed to
convey to the [District] in fee simple "the Water Front East of Lots 1, 2, 3, 4 and 5 in Block
1, Townsite of Fulton, Aransas County, Texas" (hereinafter referred to as "the Waterfront
Reserve") and in return, the [District] agreed to grant the Johnsons' predecessors in title a
99-year lease of the same real estate.


This counterclaim was severed by written order of the trial court dated March 18, 2004. According to the
Johnsons, a final judgment was rendered in the severed case in favor of the District. The District states that
its claim to ownership of the Johnson property as reflected in this counterclaim "is entirely separate from the
District's claim based on the 1947 Patent and does not affect the issues raised in this case." In any event,
neither party challenges the order of severance, and we do not consider the issue here.
4. The record reflects that the parties stipulated that the issues of attorney's fees and damages would
be submitted to the trial court and would not be an issue for the jury. Prior to the entry of the final judgment,
the court denied the Johnsons' request for attorney's fees. With respect to damages, the final judgment
stated:


After the rendition of the jury's verdict, the parties stipulated that the amount of damages
claimed by the [Johnsons] is exactly offset by the credit to which the [District] is entitled for
the value of improvements it made in good faith to the disputed property while it was in
possession.
5. The District enumerates eight separate issues on appeal, including two regarding sufficiency of the
evidence and two regarding alleged errors in the jury charge. For purposes of organization, we renumber the
District's issues as six and address them as set forth above.
6. The Texas Supreme Court has held that "shoreline boundaries in civil law land grants must be
determined with reference to measured mean daily high water levels." John G. & Marie Stella Kenedy Mem'l
Found. v. Dewhurst, 90 S.W.3d 268, 281 (Tex. 2002); Luttes v. State, 324 S.W.2d 167, 187 (Tex. 1958). The
land grants at issue in Luttes and Kenedy were executed in the early 19th century and so Mexican or Spanish
civil law regarding shoreline boundaries applied. Although neither party contends that Mexican or Spanish
civil law is applicable to the land grant at issue here, they do not appear to dispute that the mean daily high
water level determines the location of a natural shoreline for purposes of this case.
7. Erosion is the process of wearing away the land; accretion is the process of gradual enlargement
of the land. Coastal Indus. Water Auth. v. York, 532 S.W.2d 949, 952 (Tex. 1976).
8. The Johnsons' trial counsel did not list Owens as a witness in its list of fact witnesses for trial filed
with the trial court. The District objected to Owens testifying as a rebuttal witness; the trial court denied the
objection. This decision of the trial court, which is now being appealed by the District, will be discussed herein.
9. In addition to the 1930 and 1948 overhead photographs, the District introduced as evidence oblique
aerial photographs of the area taken in 1946 and in 1947. Both oblique aerial photographs clearly show the
protrusions of land that appeared in the 1948 overhead photograph. Because both the 1930 and 1948
photographs were taken from the same angle--that is, from directly overhead the area at issue--the District
emphasized the comparison between those two photographs as evidence that the shoreline had moved.
10. Specifically, the District propounded an interrogatory to the Johnsons asking the following: "Do you
contend that the portion of the 1947 patent property which you claim to own was landward of the line of mean
high water as it existed in 1930? If so, state the complete factual basis for that contention." The Johnsons 
responded by objecting to the interrogatory and stating: "All of the Johnsons' Fulton Beach Marina property
was and continues to be above mean high water." The District then moved to compel the Johnsons' answer.


 The Johnsons' position was clarified in the following exchange between the Johnsons' counsel and
the trial court at a subsequent pre-trial hearing:


 [Johnsons' counsel]: [W]ith respect to just whether we think the land was there, the land
was always there. And there has been no - the land was never below mean
high tide, and so there was no accretion necessary to make it above mean
high tide.


 THE COURT: [Addressing District's counsel] All right. If I understand his answer to your
interrogatory in which what you're wanting to know is are they making a
claim here today that there has been some kind of accretion regarding the
shoreline that would basically go to their benefit, you've already discussed
in your particular synopsis to the Court. And you want to know whether
they're claiming that the boundary changed, if you would, by accretion, and
they're saying no.


 [Addressing Johnsons' counsel] Is that correct, Mr. Conoly?


 [Johnsons' counsel]: That's correct.
11. The jury charge instructed the jury to answer "yes" or "no" to question number one, and then to
answer question number two only if the answer to question number one was "no." Question number two read: 


Do you find from a preponderance of the evidence that the western boundary line of the
November 1946 patent survey prepared by James Jarboe is at or to the east of the natural
shoreline in the area of the "Johnson property" in dispute?


Because the jury answered "yes" to question number one, no answer was given to this second question.
12. "Substantial" is synonymous with "real" and "true"; "correct" with "accurate" and "exact." Merriam
Webster's Collegiate Dictionary 260, 1174 (10th ed. 1996).
13. During this bench conference, the trial court reversed its earlier ruling and overruled the objections
made by the District's counsel as to the questions asked by the Johnsons' counsel.
14. The District also contends that the Johnsons made a pre-trial tactical decision to classify Owens
as a rebuttal witness so that they would not need to disclose his identity. This would be an impermissible end
run around the procedural rule requiring disclosure. See Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 917
(Tex. 1992). Other than the District's bald allegations, however, the record is devoid of any indication that the
Johnsons in fact did make such a pre-trial tactical decision.
15. The District's Requested Jury Question No. 2 also included a definition of "title" as "a regular chain
of transfers of real property from or under the State of Texas" and a definition of "peaceable possession" as
"possession of real property that is continuous and is not interrupted by an adverse suit to recover the
property."
16. The District also contends that "[a]fter January 1, 2000, when the Johnsons' lease with Alby
terminated, the District was charging rent directly to the boat owners for the use of the boat slips that the
District had built." The District urges that this was sufficient evidence to establish their entitlement to the
submission of a jury question on adverse possession, citing McShan v. Pitts, 554 S.W.2d 759, 763 (Tex. Civ.
App.-San Antonio 1977, no writ), for the proposition that an adverse possession claimant can meet the
exclusivity element if his tenant occupied the disputed land. Without determining whether this allegation is
in fact sufficient to establish exclusive possession, we note that the duration of time during which the District
claims to have been "directly" charging rent to boat owners was too brief to sustain a defense under either
statute of limitations--only 15 months passed between January 1, 2000 and March 30, 2001, the date the
Johnsons filed suit. See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.024, 16.025 (Vernon Supp. 2007).